

EFILED LUCAS COUNTY
06/12/2020 02:59 PM
COMMON PLEAS COURT
BERNIE QUILTER, CLERK
efile id 54948

COURT OF COMMON PLEAS
LUCAS COUNTY, OHIO

| | |
|---|---|
| JOHN DOE, on behalf of himself and all others similarly situated<br>c/o Spangenberg Shibley & Liber LLP<br>1001 Lakeside Avenue East, Suite 1700<br>Cleveland, OH 44114<br><br>Plaintiff<br><br>vs.<br><br>PROMEDICA HEALTH SYSTEM, INC.<br>c/o CT Corporation System, Statutory Agent<br>4400 Easton Commons Way, Suite 125<br>Columbus, OH 43219<br><br>Defendant | CASE NO.<br><br>JUDGE<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT

Plaintiff, John Doe ("Plaintiff"), on behalf of himself and all others similarly situated, alleges as follows upon personal knowledge as to his own conduct and on information and belief as to all other matters based upon investigation by counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery.

### NATURE OF THE ACTION

1.      Plaintiff is a patient of Defendant ProMedica Health System, Inc. ("ProMedica").

2.      As Plaintiff's health care provider, ProMedica is prohibited from disclosing Plaintiff's personally identifiable, non-public medical information – including the content of his

communications with ProMedica – to third parties without his knowledge, consent, or authorization.

3.     ProMedica has a duty to its patients to keep their communications, diagnoses, and treatment completely confidential.

4.     ProMedica maintains a web property at www.promedica.org and an online patient portal through which it encourages patients to exchange communications to search for a doctor, learn more about their conditions and treatments, access medical records and test results, and make appointments.

5.     ProMedica expressly and impliedly promises Plaintiff and its patients that ProMedica will maintain the privacy and confidentiality of communications that patients exchange with ProMedica at its web properties.

6.     Based on patients' reasonable expectations of privacy, ProMedica's express and implied promises, statutes, rules, and industry standards protecting patients' personally identifiable, non-public medical information, and communications, patients expect that communications exchanged with ProMedica are between the patient and ProMedica only and not shared with third parties.

7.     A patient's reasonable expectations for communications with ProMedica are illustrated as follows:



8.    Instead, when a patient interacts with ProMedica through its web properties, ProMedica discloses the patient's personally identifiable, non-public medical information, and the contents of their communication to numerous third parties, illustrated as follows:



9.    ProMedica does not inform its patients that it makes these unauthorized, unprivileged disclosures of personally identifiable, non-public medical information to any of these third parties.

10.    ProMedica causes the unprivileged, unauthorized transmissions of personally identifiable, non-public medical information, and communications through computer source code that it deploys to command patient computing devices to transmit the data to third parties through invisible web bugs that include, but are not limited to, Facebook, Google, Microsoft (Bing), and Quantcast.

11.    ProMedica's conduct violates the common law and privacy laws of the State of Ohio.

## PARTIES TO THE ACTION

12.    Plaintiff John Doe is an individual residing in Wauseon, Ohio, a patient of Defendant ProMedica, and user of the ProMedica patient portal located at www.promedica.org.

13.     Defendant ProMedica is a non-profit corporation organized and existing under the laws of Ohio with its headquarters at 5520 Monroe Street, Sylvania, Ohio 43560.

14.     Defendant ProMedica is a covered entity under both Ohio Rev. Code § 3798.04 and the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 "HIPAA").

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to Ohio Revised Code Section 2305.01.

16.     Venue is proper in Lucas County pursuant to Ohio R.Civ.P. 3(C).

## FACTS COMMON TO ALL COUNTS

### STANDARDS FOR PROMEDICA'S DUTY OF CONFIDENTIALITY AND AUTHORIZATION FOR DISCLOSURE OF MEDICAL INFORMATION

### *Federal Law*

17.     Under federal law, a health care provider may not disclose personally identifiable, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

18.     Guidance from the United States Department of Health and Human Services instructs health care providers that patient status alone is protected by HIPAA.

19.     In *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … If such information was listed with health condition, health care

4

provision or payment data, *such as an indication that the individual was treated at a certain clinic*, then this information would be PHI. Emphasis added.[1]

20.     In its guidance for Marketing, the Department further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. Emphasis added.[2]

### *Ohio Law*

21.     Ohio Rev. Code § 3798.04 similarly declares that a covered entity, such as a hospital, shall not "use or disclose protected health information without an authorization that is valid under 45 C.F.R. 164.508 and, if applicable, 42 C.F.R. part 2, except when the use or disclosure is required or permitted without such authorization by Subchapter C of Subtitle A of Title 45 of the Code of Federal Regulations and, if applicable, 42 C.F.R., part 2."

22.     The Ohio Supreme Court has recognized that medical providers' duties of confidentiality and "an independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned with a physician-patient relationship." *Biddle v. Warren Gen. Hosp*., 86 Ohio St. 3d 395, 401 (Ohio 1999).

### *Ancient and Modern Industry Standards of Patient Confidentiality*

23.     A medical provider's duty of confidentiality to his or her patients is ancient.

---

[1] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf at 5.
[2] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf at 1-2.

5

24.     The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "Whatever I see or hear in the lives of my patients, whether in connection with my professional practice or not, which ought not be spoken of outside, I will keep secret, as considering all such things to be private."[3]

25.     The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."

26.     A medical provider's duty of confidentiality to patients still applies today. In fact, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

27.     AMA Code of Medical Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust. Patient privacy encompasses a number of aspects, including … personal data (informational privacy)[.] … *Physicians must seek to protect patient privacy in all settings to the greatest extent possible* and should: (a) Minimize intrusion on privacy when the patient's privacy must be balanced against other factors. (b) Inform the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware. [and] (c) Be mindful that individual patients may have special concerns about privacy in any or all of these areas. (emphasis added).

28.     AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of a patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. *Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship.* Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized

---

[3] Translation of Original Hippocratic Oath by Michael North, National Library of Medicine, National Institutes of Health, https://www.nlm.nih.gov/hmd/greek/greek_oath.html.

surrogate when the individual lacks decision-making capacity) about the purpose(s) for which access would be granted. (emphasis added).

29.     AMA Code of Medical Ethics Opinion 3.3.2 provides:

*Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored.* Physicians who collect or store patient information electronically … must: … (c) release patient information only in keeping with ethics guidelines for confidentiality. (emphasis added).

### *Patient Expectations of Patient Privacy*

30.     Confidentiality is a cardinal rule of the provider-patient relationship.

31.     Patients are aware of their medical provider's duty of confidentiality, and, as a result, have objectively reasonable expectations that their health care providers will not share their personally identifiable, non-public medical information, and communications with third parties in the absence of authorization for any purpose that is not directly related or beneficial to patient care.

32.     A recent national survey from CVS-Aetna revealed that "[p]rivacy and data security lead patients' concerns in the changing health environment." 80 percent of survey respondents "indicated that privacy was a top concern regarding their health care, while 76 percent of individuals felt the same high level of concern for their data security." Both totals are higher than the 73 percent of consumers who indicated that cost is important to their care.

### *ProMedica's Express and Implied Promises of Confidentiality*

33.     ProMedica maintains its www.promedica.org property and its patient portal with knowledge that the property is used by patients to exchange communications with ProMedica relating to their providers, treatments, services, and access to a promised "secure" patient portal called MyChart.

34.     ProMedica does not inform patients that their personally identifiable information and the content of their communications at www.promedica.org and MyChart are disclosed to Facebook, Google, and numerous other third parties for marketing purposes.

35.     ProMedica does not obtain any authorization from patients to use their data and communications at www.promedica.org for marketing purposes in connection with third parties.

36.     Instead of providing notice and obtaining authorization for use of patient data and communications for marketing purposes, ProMedica expressly promises confidentiality.

37.     The www.promedica.org property includes two separate privacy statements:

      a.      "Notice of Privacy Practices"; and

      b.      "Social Media Policies".

38.     As discussed in more detail below, ProMedica makes false or misleading statements about privacy in these documents.

### HOW PROMEDICA DESIGNED ITS WEBSITE TO SECRETLY DISCLOSE PERSONALLY IDENTIFIABLE, NON-PUBLIC MEDICAL INFORMATION TO THIRD PARTIES

#### *ProMedica's Web Property*

39.     Defendant maintains a website designed for patients to communicate with Defendant, including, but not limited to, exchanging communications about conditions, treatments, providers, payments, and access to medical records through the MyChart patient portal.

40.     Defendant actively encourages patients to use the www.promedica.org website.

41.     Defendant's home page at www.promedica.org shows how the website is designed for use by Defendant's patients and potential patients. The home page provides patients with prominent links to, among other things:

      a.      Patient Resources;

      b.      Medical Services;

    c.      Our Locations; and

    d.      Patient Login.



*Basic Concepts of Webpage Design and Operation*

**Source Code**

42. Web browsers are software applications that allow consumers to exchange electronic communications over the Internet.

43. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with Internet users via their web browsers.

44. The basic command that web browsers use to communicate with website servers is called a GET request. For example, when a patient types https://www.promedica.org/Pages/health-library/article.aspx?articleid=42,BreastCancerRisk&langcode=en into the navigation bar of his or her web browser (or, just as frequently, takes the technological shortcut of clicking a hyperlink), the patient's web browser makes connection with the server for ProMedica and sends the following request: "GET /Pages/health-library/article.aspx?articleid=42,BreastCancerRisk&langcode=en HTTP/1.1".

45.     The other basic request utilized by web browsers is a POST request, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or a submit button. 'POST' sends the data entered in the form to the server for the website.

46.     In response to receiving a GET or POST request, the server for the entity with which the user is exchanging communications will send a set of instructions to the web browser, commanding the browser with source code that directs the browser (1) how to render the website's response communication and, in many circumstances, (2) commands the browser to contemporaneously re-direct the precise content of the user's communications to third parties.

47.     The set of instructions that command the browser is called source code.

48.     Source code may also command a web browser to send data transmissions to third parties via pixels or web bugs, tiny 1x1 invisible GIF files that effectively open a spying window through which a website funnels data about users and their actions to third parties.

49.     The third parties to whom a website transmits data through pixels or web bugs do not provide any substantive content relating to the user's communication. Instead, these third parties are typically procured to track user data and communications for marketing purposes.

50.     The web bugs are tiny and camouflaged to purposefully remain invisible to the user.

51.     Thus, without any knowledge, authorization, or action by a user, a website developer like ProMedica can use its source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the user's personally identifiable, non-public medical information to third parties.

**Tag Managers**

52.     Web bugs or web pixels can either be placed directly on a page by a web developer or funneled through a "tag manager" service to make the invisible tracking more efficient and

10

further obscure the third parties to whom user personally identifiable, non-public information, and communications are re-directed without their knowledge, consent, or any further action.

53.     In the absence of a tag manager, a website developer who chooses to deploy third-party source code on their website must enter the third-party source code directly onto their website for every third party to whom they wish to direct user data and communications. On websites with several third-party trackers, this may cause the page to load more slowly and increases the risk of a coding error effecting functionality and usability. A "tag manager" offers the website developer a solution. Instead of placing all third-party source code directly on the webpage, the developer places the source code for the tag manager. The developer then places the other third-party source code within its account at the tag manager.

54.     Google explains the benefits of Google Tag Manager in an Introduction to Google Tag Manager video on YouTube.[4] Google explains:

> Tags on your website help you measure traffic and optimize your online marketing. But all that code is cumbersome to manage. It often takes too long to get new tags on your site or update existing ones. This can delay campaigns by weeks or months so you miss valuable opportunities, data, and sales. That's where tag management comes in. Google Tag Manager is a powerful free tool that puts you the marketer back in control of your digital marketing. You update all your tags from Google Tag Manager instead of editing the site code. This reduces errors, frees you from having to involve a web master, and lets you quickly deploy tags on your site.
>
> Here's how it works. Sign in with an existing Google Account. Go to Google.com/tagmanager and create an account for your company. We'll name this one after the name of our company, Example Inc. Next, create a container for your domain name. We'll name this one after our website, example.com. This container will hold all the tags on the site. When you create a container, Google Tag Manager generates a container snippet to add to your site. Copy this container snippet and paste it into every page of your site. Paste the snippet below the opening body tag. Once you've pasted the container snippet into your site, you add and edit your tags using Google Tag Manager. You can add any marketing or measurement tag you want, whenever you want.

---

[4] *See* https://www.youtube.com/watch?v=KRvbFpeZ11Y, audio from 0:04 to 1:40.

55.     ProMedica deploys Google Tag Manager on its websites through an "iframe," a nested "frame" that exists within the ProMedica website that is, in reality, an invisible window through which ProMedica funnels web bugs to secretly transmit personally identifiable, non-public medical information to third parties without any knowledge, consent, authorization, or further action of patients.

56.     ProMedica's use of Google Tag Manager source code is intentionally designed to be invisible. For example, on its "Breast Cancer Risk Assessment" page, the Google Tag Manager source code deployed by ProMedica specifies that the "iframe" on the page has a height of 0, a width of 0, display of none, and visibility of "hidden".

```
198  <!-- Google Tag Manager -->
199  <noscript><iframe src="//www.googletagmanager.com/ns.html?id=GTM-KS53DT"
200  height="0" width="0" style="display:none;visibility:hidden"></iframe></noscript>
201  <script>(function(w,d,s,l,i){w[l]=w[l]||[];w[l].push(
202  {'gtm.start': new Date().getTime(),event:'gtm.js'}
203  );var f=d.getElementsByTagName(s)[0],
204  j=d.createElement(s),dl=l!='dataLayer'?'&l='+l:'';j.async=true;j.src=
205  '//www.googletagmanager.com/gtm.js?id='+i+dl;f.parentNode.insertBefore(j,f);
206  })(window,document,'script','dataLayer','GTM-KS53DT');</script>
207  <!-- End Google Tag Manager -->
```

57.     ProMedica then funnels invisible 1x1 web bugs or pixels through this purposefully invisible iframe to transmit patient data and communications to third parties for marketing purposes.

12

58.     Because ProMedica uses an invisible iframe to hide its web bugs, none of the tracking is visible or disclosed to patients on the ProMedica website. Instead, the data transmissions are accomplished through invisible pixels inside of an invisible iframe:



59.     ProMedica places the Google Tag Manager source code in the header of its webpages because coding a webpage in this manner reduces the chances that their patients would be able to successfully prevent the disclosures even if they attempt to do so.

**The Facebook Pixel**

60.     ProMedica secretly deploys the Facebook Pixel program on its website.

61.     The Facebook Pixel, a product for Facebook Business, is a "piece of code" that lets developers "measure, optimize, and build audiences for … ad campaigns."[5]

62.     The Facebook Pixel works through an invisible 1x1 gif as explained above.

63.     ProMedica deploys the Facebook Pixel through its invisible Google Tag Manager iframe.

---

[5] https://www.facebook.com/business/learn/facebook-ads-pixel.

13

64.    Key features of the Facebook Pixel include its ability to help developers:

a.    "Measure cross-device conversions" and "understand how your cross-device ads help influence conversion";

b.    "Optimize delivery to people likely to take action" and "ensure your ads are shown to the people most likely to take action"; and

c.    "Create custom audiences from website visitors" and create "dynamic ads [to] help you automatically show website visitors the products they viewed on your website – or related ones".

65.    Facebook warns developers that the Facebook Pixel causes transmission of personally identifiable information because it "relies on Facebook cookies, which enable [Facebook] to match your website visitors to their respective Facebook User accounts."

# Implementation

The Facebook pixel is a snippet of JavaScript code that loads a small library of functions you can use to track Facebook ad-driven visitor activity on your website. It relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can tally their actions in the Facebook Ads Manager and Analytics dashboard, so you use the data to analyze your website's conversion flows and optimize your ad campaigns.

66.    Facebook further explains "How the Facebook Pixel Works":

## How the Facebook pixel works

When someone visits your website and takes an action (for example, buying something), the Facebook pixel is triggered and reports this action. This way, you'll know when a customer took an action after seeing your Facebook ad. You'll also be able to reach this customer again by using a custom audience. When more and more conversions happen on your website, Facebook gets better at delivering your ads to people who are more likely to take certain actions. This is called conversion optimization.

14

67.    Facebook recommends that the pixel code be placed early in the source code for any given web page or website to ensure that the user will be tracked:

**Installing The Pixel**

To install the pixel, we highly recommend that you add its base code between the opening and closing `<head>` tags on every page where you will be tracking website visitor actions. Most developers add it to their website's persistent header, so it can be used on all pages.

Placing the code within your `<head>` tags reduces the chances of browsers or third-party code blocking the pixel's execution. It also executes the code sooner, increasing the chance that your visitors are tracked before they leave your page.

68.    Through the source code deployed by ProMedica, the cookies that it uses to help Facebook identify patients include, but are not necessarily limited to, cookies named: c_user, datr, fr, and fbp.

69.    The c_user cookie is a means of identification for Facebook users. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one – and only one – unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

70.    A skilled computer user can obtain the c_user cookie value for any Facebook user through the following steps: (1) going to the user's Facebook page, (2) right-clicking on their mouse, (3) selecting 'View page source,' (4) executing a control-F function for "fb://profile," and (5) copying the number value that appears after "fb://profile" in the page source code of the target Facebook user's page.

71.    It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log into Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier. For example, the c_user cookie value for Mark Zuckerberg is 4. Logging

into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

72.     The datr cookie identifies a patient's specific web browser from which the patient is sending the communication. It is an identifier that is unique to the patient's specific web browser and is therefore a means of identification for Facebook users. Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

73.     The fr cookie is a Facebook identifier that is an encrypted combination of the c_user and datr cookies.[6]

74.     The fbp cookie is a Facebook identifier that is set by Facebook source code and associated with ProMedica's use of the Facebook Pixel program. The fbp cookie is a Facebook cookie that masquerades as a first-party cookie to evade third-party cookie blockers and share data more directly between ProMedica and Facebook.

75.     Facebook promises users that it requires partners who use Facebook Business Tools to "have lawful rights to collect, use, and share your data before providing any data" to Facebook.

76.     Although it has the technological capabilities of ensuring that its partners actually have the lawful rights to collect, use, and share user data before providing it, Facebook does not actually *require* its partners to do so.

77.     Instead, Facebook places a provision in its purported form contract with web developers that instructs developers such as ProMedica to "obtain adequate consent" before using the Facebook Pixel.

---

[6] *See* Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission, Mar. 27, 2015, available at https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

78.     According to Facebook, "adequate consent" means ProMedica must make "appropriate disclosures … [t]hat third parties, including Facebook, may use cookies, web beacons, and other … technologies to … receive information from" ProMedica. Facebook Platform Policy at ¶ 2.8. In another provision, Facebook instructs developers to provide "robust and sufficient prominent notice" everywhere that the Facebook Pixel is used. Facebook Business Tools Terms at ¶ 3.

79.     ProMedica fails to follow Facebook's standards for obtaining consent.

### Other Personally Identifiable Tracking Data

80.     In addition to first- and third-party cookie values, ProMedica uses and permits the following other personally identifiable data to be sent to and accessed by Facebook:

     a.     Patient IP addresses;

     b.     Patient User-Agent identifiers; and

     c.     Patient browser fingerprints.

81.     These data elements are all personally identifiable as a matter of law and fact:

     a.     HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the examples of medical record numbers, account numbers, device identifiers, serial numbers, URLs and IP addresses. *See* 45 C.F.R. § 164.514(2).

     b.     HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii).

     c.     Ohio has adopted the HIPAA definitions in Ohio Rev. Code § 3798.04.

d.    To Plaintiff's knowledge, every federal agency charged with rulemaking to determine the definition of personally identifiable information has found that the types of data used and disclosed by ProMedica are personally identifiable.

### *Patient IP Addresses are Personally Identifiable*

82.    An IP address is a number that identifies the address of a device connected to the Internet.

83.    IP addresses are used to identify and route communications on the Internet.

84.    IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

85.    Facebook tracks every IP address ever associated with a Facebook user.

86.    Google tracks IP addresses associated with specific Internet users.

87.    The other third-party marketing companies that ProMedica procured to obtain the contents of patient communications associate particular IP addresses with specific Internet users.

88.    Individual homes and their occupants can be, and are, tracked and targeted with advertising using IP addresses.

89.    Under HIPAA, an IP address is considered personally identifiable information. *See* 45 C.F.R. § 164.514(b)(2)(i)(O).

90.    ProMedica uses and causes the disclosure of patient IP addresses to third parties with each re-directed communication described herein, including Patient Portal log-in communications and communications concerning individual providers, conditions, and treatments.

91.    In addition to disclosing IP addresses, ProMedica uses and causes the disclosure of patient User Agent information. The User Agent information identifies the application, operating

system, and version of the patient's device. In a household with more than one computer, the IP address would identify the household and the User Agent would distinguish the different devices within the household.

### *Internet Cookies are Personally Identifiable*

92.     In the early years of the Internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

93.     Computer programmers eventually developed 'cookies' – small text files that web servers can place on a person's web browser and computing device when that person's web browser interacts with the website server. Some cookies are designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

94.     Cookies are designed to, and, in fact, do operate as means of identification for Internet users.

95.     Cookies are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

96.     In general, cookies are categories by (1) duration and (2) party.

97.     There are two types of cookies classified by duration:

> a.     "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

     b.     "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

98.     Cookies are also classified by the party that uses the collected data.

     a.     "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. For example, ProMedica sets a collection of its own cookies on patients' browsers when they visit any web page on the ProMedica website. First-party cookies can be helpful to the user, server, and/or website to assist with security, log in, and functionality.

     b.     "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits ProMedica will also have cookies on their device from third parties, such as Facebook. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

99.     Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to that person's communications and habits. To build individual profiles of Internet users, third-party data companies assign each user a unique, or a set of unique identifiers to each user.

100.    ProMedica uses and causes the disclosure of patient cookie identifiers to third parties with each re-directed communication described herein, including patient communications on the patient portal log-in page and communications concerning individual providers, conditions, and treatments.

### *Browser Fingerprints are Personally Identifiable*

101.    A browser fingerprint is information collected about a computing device that can be used to identify the device.

102.    A browser fingerprint can be used to identify a device when the device's IP address is hidden, and cookies are blocked.

103.    The Electronic Frontier Foundation has explained:

When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[7]

104.    Google recently explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites. Unlike cookies, users cannot clear their fingerprint, and therefore cannot control how their information is collected."[8]

---

[7] Katarzyna Szymielewicz and Bill Dudington, Electronic Frontier Foundation, <u>The GDPR and Browser Fingerprinting:  How  It  Changes  the  Game  for  the  Sneakiest  Web  Trackers</u>, https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers.

[8] https://www.blog.google/products/chrome/building-a-more-private-web/

105.    In 2017, researchers showed that browser fingerprinting techniques can successfully identify 99.24 percent of users.[9]

106.    Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

107.    ProMedica uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications within the Patient Portal and on the patient portal log-in page, and communications concerning individual providers, conditions, and treatments.

### THE THIRD PARTIES TO WHOM PROMEDICA MAKES DISCLOSURES

### *Google*

108.    By many measures, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google DoubleClick and Google AdWords.

109.    Google Analytics has massive reach. As described by *The Wall Street Journal*, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged in."[10]

---

[9] Yinzhi Cao, Song Li, Erik Wijmans, (Cross-)Browser Fingerprinting via OS and Hardware Level Features, Proceedings of the Network and Distributed Security Symposium, March 2017, available at http://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf.

[10] *Who Has More of Your Personal Data than Facebook? Try Google*, *The Wall Street Journal*, https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401.

110.    Google tracks Internet users with IP addresses, cookies, geolocation, and other unique device identifiers.

111.    Google warns web developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

112.    To deploy the Google Remarketing tools, ProMedica obtains Google source code from Google and places it on the ProMedica website directly or through a tag manager.

113.    By following the instructions in the Google source code, a developer is warned that "Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[11]

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in-market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …

> You aren't allowed to do the following:

> ❌ Collect information related to sensitive interest categories (see Personalized advertising policy principles below for more about sensitive interest categories)

Google further states that "[a]dvertisers can't use sensitive interest categories to target ads or to promote advertisers' products or services." "Health" is a "[p]rohibited categor[y]" that Google states "can't be used by advertisers to targets ads to users or promote advertisers' products or services."

---

[11] https://support.google.com/adspolicy/answer/143465?hl=en

## Health in personalized advertising

❌ Personal health conditions, health issues related to intimate body parts or functions, and invasive medical procedures. This also includes treatments for health conditions and intimate bodily health issues.

- **Examples**: treatments for chronic health conditions like diabetes or arthritis, treatments for sexually transmitted diseases, counseling services for mental health issues like depression or anxiety, medical devices for sleep apnea like CPAP machines, over-the-counter medications for yeast infections, information about how to support your autistic child

Health content includes:

- physical or mental health conditions, including diseases, chronic conditions, and sexual health
- health condition-related services or procedures
- products for treating or managing health conditions, including over-the-counter medications for health conditions and medical devices
- long or short-term health issues associated with intimate body parts or functions, including genital, bowel, or urinary functions
- invasive medical procedures, including cosmetic surgery
- disabilities, even when content is oriented toward the user's primary caretaker

114. Google, however, violates its own restrictions on remarketing.

115. ProMedica deploys Google tracking tools on nearly every page on its website, thereby causing disclosure of communications exchanged with patients to be re-directed to Google. The re-directed patient communications include communications that patients make:

  a.  To sign into the patient poral by sending a "MyChart Login" communication; and

  b.  At www.promedica.org pages that pertain to the patient's communications regarding specific providers, conditions, treatments, and appointment requests.

116. ProMedica has specifically implemented the Google Analytics remarketing function to cause disclosures of communications that patients make within the Patient Portal.

### *Facebook*

117. Facebook operates the world's largest social media company.

118.    Facebook maintains profiles on users that include user's real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, including IP addresses and cookie identifiers.

119.    Facebook also tracks non-users across the web through its widespread Internet marketing products and source code.

120.    Facebook's revenue is derived almost entirely from selling targeted advertising to its users on Facebook.com and to all Internet users on non-Facebook sites that integrate Facebook marketing source code on their websites.

121.    Facebook Business is the division that provides advertising services to developers.

122.    The Facebook Pixel, described above, is a tool within Facebook Business.

### Microsoft (Bing)

123.    Though best known for its software, Microsoft also sells digital advertising through a domain associated with its search engine, Bing.com.

124.    Microsoft tracks users through IP addresses and persistent cookies.

125.    ProMedica deploys Microsoft source code on the ProMedica home page and pages relating to patient communications about specific medical conditions.

### Quantcast

126.    Quantcast markets itself as having "the world's largest AI-driven audience behavior platform for the open Internet that today directly quantifies over 100 million web and mobile destinations."

127.    Quantcast boasts that:

Having built the world's largest AI-driven insights and measurement platform, Quantcast is the real-time pulse of the internet. QIC measures the heartbeat of your consumer across their digital journey, constantly changing based on our real-time pulse of the internet.  *We know the sites visited. The keywords searched.* We

25

understand purchase habits. We turn all of this data into actionable insights, to help you grow your brand.[12]

128.    One of the services Quantcast offers is a "consent management solution" which helps "minimize impact of data privacy regulations on the purchase funnel."

129.    ProMedica deploys Quantcast source code on the ProMedica home page and pages relating to patient communications about specific medical conditions

**HOW PROMEDICA DISCLOSES PERSONALLY IDENTIFIABLE, NON-PUBLIC MEDICAL INFORMATION TO THIRD PARTIES DURING A ROUTINE DIAGNOSTIC SCHEDULING**

130.    The following illustrates a series of typical communications between patients and ProMedica, and how ProMedica secretly discloses unauthorized personally identifiable, non-public patient information, and the content of their communications to Facebook, Google, and others.

*Male Patient Wants to Schedule a Cardiac Evaluation*

131.    The patient can begin the process through one of two typical methods. The patient can either perform a search using the embedded search functionality on ProMedica's website, or it can navigate through ProMedica's website through a series of subpages.

132.    If a patient chose to navigate through ProMedica's website to learn about their cardiac risk, consider diagnostic options, and, ultimately, schedule an appointment with a doctor, ProMedica discloses this information to Facebook and other third parties, in real time, connected to personally identifiable information about the patient.

---

[12] https://www.quantcast.com/quantcast-intelligence-cloud/ (last accessed March 11, 2020) (emphasis added).

**Step 1: The Patient Visits [www.promedica.org](www.promedica.org)**

133.    First,  the  patient  starts  at  ProMedica's  main  webpage,  located  at

[www.promedica.org](www.promedica.org):



134.    The fact that the patient is at the ProMedica web property is contemporaneously

transmitted to Facebook and other third parties through a "microdata" disclosure":



**Step 2: The Patient Clicks on "Health Library" Under "Patient Services"**

135.    From there, the patient clicks on the "Patient Services" dropdown sub-menu and clicks on "Health Library" to begin his review of the cardiac assessment options ProMedica has available for its patients:



136.    ProMedica discloses to Facebook that the patient clicked to view the "Health Library" page on ProMedica's web property.

137.    ProMedica's re-direction of the communication to Facebook is done without the patient's knowledge, consent, authorization, or privilege.

138.    The following is a screenshot of some of the data ProMedica transmits to Facebook:



139.    Meanwhile, from the patient's perspective, the only thing he sees is the following page load on his screen:



140.   ProMedica makes a substantially similar disclosure to Google at that time as well:

| Name | Value |
|------|-------|
| random | 1591716800657 |
| cv | 9 |
| fst | 1591716800657 |
| num | 1 |
| guid | ON |
| resp | GooglemKTybQhCsO |
| eid | 376635471 |
| u_h | 1080 |
| u_w | 1920 |
| u_ah | 1040 |
| u_aw | 1920 |
| u_cd | 24 |
| u_his | 50 |
| u_tz | -300 |
| u_java | false |
| u_nplug | 0 |
| u_nmime | 0 |
| gtm | 2wg5r0 |
| sendb | 1 |
| ig | 0 |
| frm | 0 |
| url | https://www.promedica.org/Pages/health-library/default.aspx |
| ref | https://www.promedica.org/pages/home.aspx |
| tiba | Health Library |
| hn | www.google.com |

**Step 3: The Patient Views the "Risk Assessments" Page on ProMedica's Web Property**

141.   On the "Health Library" landing page, the patient can navigate to several individual pages providing additional information regarding specific areas of health concern. One of these pages is the "Risk Assessments" sub-page:



142.    When the patient clicks on this link to have ProMedica conduct a risk assessment, it discloses microdata of the patient's communications with ProMedica to Facebook which reveals that a specific individual visited the page:

| Name | Value |
|---|---|
| id | ▉▉▉▉▉▉▉ |
| ev | Microdata |
| dl | https://www.promedica.org/Pages/health-library/risk-assessments.aspx?subtopicid=riskassessments&contenttypeid=42&langcode=en |
| rl | https://www.promedica.org/Pages/health-library/default.aspx |
| if | false |
| ts | ▉▉▉▉▉▉▉▉ |
| cd[DataLayer] | {} |
| cd[Meta] | {"title":"\n\tRisk Assessments\n","meta:description":"Risk Assessments-Video Library …"} |
| cd[OpenGraph] | {} |
| cd[Schema.org] | {} |
| cd[JSON-LD] | {} |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.18 |
| r | stable |
| ec | 1 |
| o | ▉▉ |
| fbp | ▉▉▉▉▉▉▉▉▉▉383.1387699404 |
| it | 1591717361082 |
| coo | false |
| es | automatic |
| tm | 3 |
| rqm | GET |

143.    The source code for the "Risk Assessments" webpage has 2036 lines of code. Line 1629 warns ProMedica's web developers that the page is "personalized" and "may contain confidential information. Make sure the properties contain information that is safe for others to read."

ExecuteOrDelayUntilScriptLoaded(_RegisterWebPartPageCUI, "sp.ribbon.js"); var __wpmExportWarning='This Web Part Page has been personalized. As a result, one or more Web Part properties may contain confidential information. Make sure the properties contain information that is safe for others to read. After exporting this Web Part, view properties in the Web Part description file (.WebPart) by using a text editor such as Microsoft Notepad.';var __wpmCloseProviderWarning='You are about to close this Web Part.  It is currently providing data to other Web Parts, and these connections will be deleted if this Web Part is closed.  To close this Web Part, click OK.  To keep this Web Part, click Cancel.';var __wpmDeleteWarning='You are about to permanently delete this Web Part. Are you sure you want to do this?  To delete this Web Part, click OK.  To keep this Web Part, click Cancel.';RenderRecommendationsAsync.loadElementContent("https://www.promedica.org","https%3a%2f%2fwww.promedica.org%2fPages%2fhealth-library%2frisk-assessments.aspx%3fsubtopicid%3driskassessments%26contenttypeid%3d42%26langcode%3den","","1","0","ctl00_ctl20_g_dd1cf30d_6864_4d5c_9ac3_9b034acadd76_ctl00_RecommendationsElementsControl_RecommendationsPanel","H4sIAAAAAAAEAO29B2AcSYwljJ9tynt/SvVK1+B0oQiAYBMk2JBAEOzBiM3mkuwdaUcjKasqgcplVmVdZhZAzO2dvPfee++999577733ujudTif33/8/XGZkAWz2zkrayZ4hgKrIHz9+fB8/Io6PT4+Pj5/exXP8E8fm+eL4gv599vDFq0r9oxQq69evXn11U8+f774bOT+9Xp0u6zSxn7Dv4vz4m0+++i0O/93ia/HxOZ5R++9i6qdxIY28Aej4P8+xfHHbM/OTDvLT1+k7w+8jn3PN/kmvr1j/LN+uFKU4vj5+z8aeTfWfdp4tndb6Ze1qiY3++bFyqN2Rg4rXnd1+9XNLY-KT-z85+7xsptf3nd072dtvJ3v76q8+fLX/qq59c0+c72Xd/8gfPyyfzn9r79Yf/2YPNK9mb9g27fLX/qq59c00+c72Xd/8g"

144.   Meanwhile, the patient remains unaware of this warning or that ProMedica is sharing this information with Facebook. Rather, the patient only sees ProMedica's substantive responsive communication, which does not reveal its secret disclosures:



**Step 4: ProMedica Discloses the Patient's Risk Assessment Answers Which Includes Non-Public Medical Information, as Well as That of the Patient's Family**

145.    ProMedica encourages patients to use its online health assessment tools to "Determine your risk for developing CAD . . ."

146.    To that end, ProMedica provides a fillable web form – the contents of which are shared with Facebook – to assess its patients' risk of developing CAD.

147.    For example, if a patient tells ProMedica that they:

- Are male,
- Are older than 45,
- Have a parent or a sibling diagnosed with heart disease before they were 55,
- Have a total blood cholesterol level higher than 200 milligrams per deciliter (mg/dL),
- Do not have high blood pressure,
- Are diabetic,
- Are a non-smoker,
- Are 6' 1" tall,
- Weighs 205 lbs., and
- Lead a sedentary life,

then the following would represent ProMedica's analysis of the patient's online assessment answers:

## Coronary Artery Disease Risk Assessment

Coronary artery disease (CAD) occurs when the arteries that bring blood to the heart muscle (coronary arteries) become hardened and narrowed. The arteries harden and narrow because of a buildup of plaque on the inner walls. Plaque is made up of cholesterol and fatty deposits. This is called atherosclerosis. Narrowing of the coronary arteries can limit blood flow to the heart. This means less oxygen gets to the heart. Less oxygen can lead to angina, heart failure, irregular heart rhythm, and heart attack.

CAD is the most common type of heart disease. It is the leading cause of death in the U.S. in both men and women. Other names for CAD are coronary heart disease (CHD), heart disease, and ischemic heart disease.

First, select your gender. Then answer the questions to help learn your risk for CAD.

**YOUR GENDER?**

◉ MALE

◯ FEMALE

**1. ARE YOU OLDER THAN 45?**

◉ YES

◯ NO

**2. WERE YOUR PARENTS OR A SIBLING DIAGNOSED WITH HEART DISEASE BEFORE THEY WERE 55?**

◉ YES

◯ NO

**3. IS YOUR TOTAL BLOOD CHOLESTEROL LEVEL HIGHER THAN 200 MILLIGRAMS PER DECILITER (MG/DL)?**

◉ YES

◯ NO

**4. HAVE YOU BEEN TOLD YOU HAVE HIGH BLOOD PRESSURE?**

◯ YES

◉ NO

**5. DO YOU HAVE DIABETES (EITHER TYPE 1 OR TYPE 2)?**

◉ YES

◯ NO

**6. DO YOU SMOKE TOBACCO?**

◯ YES

◉ NO

**7. WHAT IS YOUR HEIGHT?** 6   FEET 1   INCHES

**8. WHAT IS YOUR CURRENT WEIGHT?** 205   lbs.

**9. DO YOU LEAD A SEDENTARY LIFE?**

◉ YES

◯ NO

Submit

This assessment is not intended to replace the evaluation of a healthcare professional.

148.    Yet, the patient remains unaware that ProMedica secretly discloses all of this protected non-public medical information directly to Facebook:



149.    Upon close inspection, ProMedica's disclosure reveals all of this non-public medical information in plain English in its disclosure to Facebook:





&CoronaryArteryDiseaseCalc_Parameters=m,Y,Y,Y,N,Y,N,6,1,205,Y

150.    ProMedica's disclosure tells Facebook the patient's response to each individual medical question which includes both individual and family protected non-public medical information:

- Male,
  =m,
- Older than 45,
  ,Y,
- Has a parent or a sibling diagnosed with heart disease before they were 55;
  ,Y,
- Has a total blood cholesterol level higher than 200 milligrams per deciliter (mg/dL),
  ,Y,
- Does not have high blood pressure,
  ,N,
- Is diabetic,
  ,Y,
- Non-smoker,
  ,N,
- Is 6' 1" tall,
  ,6,1,
- Weighs 205 lbs., and
  ,205,
- Leads a sedentary life,
  ,Y

151.    Yet the patient remains unaware of these secret disclosures, only seeing ProMedica's analysis of their assessment populate the screen:



### Overweight

Your body mass index (BMI) is 27. Your BMI gives you an estimate of your body fat. A BMI of 25 to 29.9 means you are overweight. A BMI of 30 or higher means you are obese. Your extra pounds—especially if most of them are around your waist—make it more likely that you will develop CAD. Extra weight makes your heart work harder and raises your blood pressure. It also raises your total cholesterol and triglyceride levels, and lowers your HDL ("good") cholesterol levels. Extra weight can make you more likely to develop diabetes. Many obese and overweight people may have difficulty losing weight. Talk with your healthcare provider about how to lose weight. You may need to follow a weight-loss program.

### Physical inactivity

Your lack of regular exercise puts you at risk of developing CAD. Regular, moderate exercise helps control cholesterol levels and blood pressure. It also helps prevent type 2 diabetes and obesity. The more vigorous your exercise, the greater the benefits, according to the American Heart Association. Be sure to check with your healthcare provider before starting an exercise program. Your provider can also help you decide which exercise is best for you.

### Preventing CAD

These are steps you can take to cut your risk for CAD:

- Don't smoke. If you do smoke, quit. Talk with your healthcare provider if you need help in quitting.
- Stay away from secondhand smoke.
- Limit how much alcohol you drink. If you are a man, limit your alcohol to no more than 2 drinks a day. If you are a woman, limit your alcohol to no more than 1 drink a day.
- Exercise 3 to 4 days a week. Aim for 40 minutes on average of moderate- to high-intensity exercise each day. Be sure to check with your healthcare provider before starting an exercise program.
- Eat a healthy diet. This means limiting the amount of saturated fat and cholesterol you eat.
- Control your blood pressure. If you have high blood pressure, follow your healthcare provider's advice on how to lower it.
- Control your cholesterol levels. If you have high cholesterol levels, follow your healthcare provider's advice on how to lower it.
- Manage your weight. Lose weight if you need to.

*This information is not intended as a substitute for professional health care. Always consult with a healthcare provider for advice about your health. Only your healthcare provider can tell if you have coronary artery disease.*

**This assessment is not intended to replace the evaluation of a healthcare professional.**

**Step 5: The Patient Decides Schedule an Appointment with a Cardiologist**

152.     After reviewing the results of ProMedica's assessment of the patient's CAD risk,

he could then choose to schedule an appointment with a cardiologist.

40

153.    To begin the process, the patient would click on "Patient Resources" and select "Find a Doctor":



154. Meanwhile, ProMedica immediately discloses to Facebook that the patient has left the CAD assessment page (including, once again, the patient's responses to the assessment questionnaire) in order to "Find a Doctor":



**Step 6: The Patient Searches for a Cardiologist**

155. The Find a Doctor page allows the patient to search for a doctor by pre-established criteria and then view the profiles of the doctors listed in the responsive communication. If the patient searched for a cardiologist within 40 miles of zip code 43615, ProMedica would disclose the contents of this communication to Facebook:



## Step 7: The Patient Selects a Cardiologist

156.    Finally, when the patient selects an individual cardiologist from ProMedica's responsive communication, ProMedica discloses that information to Facebook:



## Step 8: ProMedica Re-Discloses a Compilation of All of the Previously Disclosed Medical Information to Third Parties When the Patient Signs Into ProMedica's Patient Portal

157.    If at any point during the above series of communications between ProMedica and the patient, the patient decides to sign into his patient portal, ProMedica will not only re-disclose all the previously disclosed non-public medical information, but necessarily also his patient status through a disclosure notifying, for example, Google that a specific patient is logging into their patient portal account.

158.    For example, this disclosure reveals patient status ("MyChart Login") and individual and family non-public medical information (CAD Risk Assessment inputs):





| Name | Value |
|------|-------|
| v | 1 |
| _v | j82 |
| aip | 1 |
| a | 295219584 |
| t | event |
| ni | 0 |
| _s | 1 |
| dl | https://www.promedica.org/Pages/health-library/article.aspx?articleid=42,CoronaryArteryDiseaseMRA&langcode=en&CoronaryArteryDiseaseCalc_Parameters=m,Y,Y,Y,N,Y,N,6,1,205,Y |
| ul | en-us |
| de | UTF-8 |
| dt | Coronary Artery Disease Assessment |
| sd | 24-bit |
| sr | 1920x1080 |
| vp | 964x948 |
| je | 0 |
| ec | Subdomain |
| ea | Click |
| el | MyChart Login | Sign Up - https://mychart.promedica.org/MyChart/ |
| _u | SCCACEABB~ |
| jid | 1394963576 |
| gjid | 212264460 |
| cid | 1760985178.1591647468 |
| tid | UA-5001604-1 |
| _gid | 1184861480.1591647468 |

*Female Patient Wants to Schedule a Mammogram*

159.    The patient can begin the process through one of two typical methods. The patient can either perform a search using the embedded search functionality on ProMedica's website, or she can navigate through ProMedica's website through a series of subpages.

160.    If a patient chose to navigate through ProMedica's website to learn about their breast cancer risk, consider diagnostic options, and, ultimately, schedule an appointment with her doctor, ProMedica discloses *all of this information* to Facebook and other third parties, in real-time, connected to personally identifiable information about the patient.

**Step 1: The Patient Visits www.promedica.org**

161.    First,  the  patient  starts  at  ProMedica's  main  webpage,  located  at www.promedica.org:



* * * *



162.     The fact that the patient is at the ProMedica web property is contemporaneously transmitted to Facebook and other third parties through a "microdata" disclosure:



**Step 2: The Patient Clicks on "Women's Service" Under "Medical Services"**

163.    From there, the patient clicks on "Medical Services" dropdown sub-menu and clicks on "Women's Services" to begin their review of the breast cancer diagnostic options ProMedica          has          available          for          its          patients:



164.    As soon as the patient clicks on "Women's Services" ProMedica begins the process disclosing the patient's personally identifiable, non-public medical information to third parties through a 'GET' request.

165.    ProMedica discloses to Facebook that the patient clicked to view the "Women's Services" page on ProMedica's web-property.

166. ProMedica's re-direction of the communication to Facebook is done without the patient's knowledge, consent, authorization, or privilege.

167. The following is a screenshot of some of the data ProMedica transmits to Facebook:



168. In addition to this data, ProMedica transmits to Facebook the patient's IP address, User Agent data, information sufficient to form a browser fingerprint, and unique persistent Facebook cookies values.

169. Meanwhile, from the patient's perspective, the only thing she sees is the following page load on her screen:





**Step 3: The Patient Views the "Breast Health" Page on ProMedica's Web Property**

170.    On the "Women's Services" landing page, the patient can navigate to several individual pages providing additional information about specific services provided by the hospital. One of these pages is the "Breast Health" sub-page:



48

171.    Once again, when the patient clicks on this link to learn more about breast cancer treatment at ProMedica, ProMedica discloses microdata of the patient's communications with ProMedica to Facebook which reveals that a specific individual visited the page:



172.    Meanwhile, from the patient's perspective, the only thing they see is the following page load on their screen:



### Step 4: The Patient Accepts ProMedica's Invitation to Take
### Its Breast Cancer Risk Assessment

173.    Scanning further down the "Breast Health" page leads the patient to the "Breast Cancer" area of ProMedica's web property. This section includes a link to "Take our breast cancer risk assessment":



174.    Upon agreeing to take the assessment and clicking its link, the patient is sent to ProMedica's "Breast Health Assessment" page:



175.    Once again, ProMedica immediately discloses the microdata associated with the patient's decision to take the quiz to Facebook:



176.    Meanwhile, the patient remains unaware that ProMedica is sharing this information with Facebook. Rather, the patient only sees the ProMedica's substantive responsive communication, which does not reveal its secret disclosures.

**Step 5: ProMedica Discloses the Patient's Risk Assessment Answers to Facebook Which Includes Non-Public Medical Information, as Well as That of the Patient's Family**

177.    ProMedica encourages patients to use its online health assessment tools to "help you learn if you have risk factors that may raise your breast cancer risk."

178.    The source code for the "Risk Assessments" webpage has 1982 lines of code. Line 1588 warns ProMedica's developers that the page is "personalized" and "may contain confidential information. Make sure the properties contain information that is safe for others to read":

179.    The warning ProMedica hid in its source code does not appear anywhere on the

page displayed on its patients' computer screens:



180.    ProMedica provides a fillable web form – the contents of which are shared with

Facebook – to assess its patients' risk of developing breast cancer.

181.    For example, if a patient tells ProMedica that they:

- Are 55 years old,
- Caucasian,
- Weigh 155 lbs.,
- Are 5' 6" tall,
- Had their first menstrual period at age 12,
- Began menopause at age 53,
- Have more than 1 child,
- Was 24 years old when they had their first child,
- Is a smoker,
- Patient's mother, aunt, and grandmother all had breast cancer,
- Have ovarian cancer,
- Has genetic mutations linked to breast cancer, and
- Has been diagnosed with atypical lobular hyperplasia (ALH),

then the following would represent that patient's online assessment answers:







182.    Yet, ProMedica secretly discloses all of this protected non-public medical information directly to Facebook as a "SubscribedButtonClick", along with HIPAA personally identifiable information in the form of their c_user, datr, fr, and fbp cookies, their IP address, User Agent, and browser fingerprint information:



183.    Upon close inspection, ProMedica's disclosure reveals all of this non-public medical information in plain English in its disclosure to Facebook:





184.    ProMedica's disclosure tells Facebook the patient's response to each individual medical question which includes both individual and family protected non-public medical information:

- 55 years old,
- Caucasian,
- Weighs 155 lbs.,
- 5' 6" tall,
- First menstrual period at age 12,
- Began menopause at age 53,



- Has more than 1 child,



- 24 years old she they had her first child,



- Smoker,



- Patient's mother, aunt, and grandmother all had breast cancer (yes is denoted as "1"; no is a "0")



- Has ovarian cancer,



- Has genetic mutations linked to breast cancer, and

- Has been diagnosed with atypical lobular hyperplasia (ALH) (yes is denoted as a "1", no is a "0")

185. Yet the patient remains unaware of these secret disclosures, only seeing ProMedica's analysis of their assessment populate the screen:



**Step 6: The Patient Decides Which Breast Cancer Diagnostic Test to Take**

186.     After reviewing the results of ProMedica's assessment of the patient's breast cancer

risk, she could then choose the type of diagnostic exam she is interested in obtaining from the

dropdown menu on the Breast Health Assessment page:



187.     In this case, the patient's selection of "Digital Mammography" would lead them to

the associated page explaining the benefits and applications of a digital mammography:



188.     Meanwhile, ProMedica immediately discloses to Facebook that the patient has left

the Breast Health Assessment page in order to view the Digital Mammography page (which once

again reminds Facebook of the patient's responses to ProMedica's breast health risk assessment

tool):



**Step 7: The Patient Chooses a Facility for Their Mammogram**

189.    The Digital Mammography page allows the patient to link directly to a list of facilities that offer her chosen digital mammography via the "Find one near you" link:



190.    When a patient clicks to find a location for her mammogram, ProMedica discloses microdata to Facebook indicating that the patient is looking for a location for her mammogram:



191.    Even more troubling, when the patient clicks an individual hospital to perform her mammogram, *ProMedica discloses to Facebook the name, location, department, and exam type*:



- ProMedica Breast Care
  /promedica-breast-care.
- In Toledo
  /toledo-hospital/
- Radiology Unit
  SpecificOrgUnitTypeName=Radiology.
- Digital Mammography
  OrgUnitName=digital%20mammography

**Step 8: ProMedica Re-Discloses a Compilation of All of the Previously Disclosed Medical Information to Facebook When the Patient Signs Into ProMedica's Patient Portal**

192.    If at any point during the above series of communications between ProMedica and the patient, the patient decides to sign into her patient portal, ProMedica will not only re-disclose all the previously disclosed non-public medical information to Facebook, but necessarily also her

patient status through a "SubscribedButtonClick" informing Facebook that a specific patient is logging into their patient portal account.

193.    For example, this disclosure reveals patient status ("MyChart Login"), individual and family non-public medical information (breast health assessment inputs), and patient's chosen procedure (digital mammography):



<div align="center">

**PROMEDICA MAKES SUBSTANTIALLY SIMILAR DISCLOSURES
THROUGHOUT ITS WEB PROPERTY**

</div>

194.    The same or substantially similar disclosures are made to Facebook, Google, and the other third parties every time a patient exchanges a communication with ProMedica at the ProMedica web property set-up for patients at www.promedica.org.

195.    Other patient communications regularly disclosed by ProMedica to Facebook, Google, and others include:

a.    Every time a patient views the profile page for their doctor or potential doctor;

b.    Every time a patient reviews "Medical Services" offered by ProMedica;

c.    Every time a patient uses the ProMedica "online health library", and

d.    Every time a patient clicks a link to log into to their online patient portal called MyChart.

**PROMEDICA'S DISCLOSURES MUST BE CONSIDERED INDIVIDUALLY AND AS A WHOLE**

196.    Each of the individual data elements described above is personally identifiable, non-public medical information on their own. However, ProMedica's disclosures of such personally identifiable, non-public medical elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and others that expressly state they use such data elements to identify individuals.

**PROMEDICA'S DISCLOSURES ARE NOT PUBLIC INFORMATION**

197.    The www.promedica.com web property is publicly available to patients, potential patients, and other Internet users just as ProMedica hospitals are publicly available.

198.    The fact that Plaintiff is a patient of ProMedica is not publicly available.

199.    The fact that Plaintiff exchanged communications with ProMedica at its web property is not publicly available.

200.    The facts that Plaintiff has registered for, used, and exchanged communications with ProMedica inside the MyChart patient portal, and the specific data and times associated with those communications, are not publicly available.

201.    The specific communications exchanged between Plaintiff and ProMedica, including communications about specific appointments, providers, conditions and treatments, are not publicly available information – regardless of whether such communications occurred before or after Plaintiff or patients had signed into MyChart.

202.    The department that provides care for Plaintiff is not publicly available.

203.    The treatment that Plaintiff receives is not publicly available.

204.     The locations of Plaintiff's appointments are not publicly available.

205.     The personal information that ProMedica causes to be disclosed to third parties about patients after they have signed into the MyChart portal is not public information.

### PROMEDICA IS ENRICHED FOR MAKING THE UNAUTHORIZED DISCLOSURES

206.     The purpose of ProMedica's disclosures and procurement of third parties to intercept patient communications is marketing.

207.     In exchange for disclosing personally identifiable, non-public patient data, and communications, ProMedica is compensated by the third parties with enhanced advertising services, including, but not limited to, re-targeting.

208.     This barter transaction between ProMedica and the third parties constitutes a sale.

209.     As described below, the third parties then work with ProMedica to target patients with advertisements on different websites and different computing devices.

210.     The third parties also take the personal information disclosed by ProMedica and the contents of communications and uses them to create detailed profiles on individual consumers that the third parties can and do use for their own purposes.

211.     Once the personally identifiable, non-public medical information relating to patients is disclosed to third parties, ProMedica loses the ability to control its further dissemination and use. As described below, several of the third parties share and use data with fourth parties and use data collected from websites such as the ProMedica website to sell marketing products to others.

212.     Retargeting is a form of online targeted advertising that targets users with ads based on their previous Internet communication and interactions.

213.    Retargeting is facilitated through the deployment of tracking pixels and cookies. Once data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the Internet.

214.    Retargeting enables ProMedica to show advertisements on other websites to patients or potential patients based on specific communications exchanged at ProMedica's property. Using the Facebook Pixel, ProMedica can target ads on Facebook itself or the Facebook advertising network to patients for whom Facebook recorded actions at ProMedica. The same or similar targeted actions can be accomplished via disclosures to the other third-party marketing companies.

215.    In addition to enabling ProMedica to advertise to patients and potential patients on non-ProMedica websites, ProMedica's disclosures of patient data and communications also facilitates the third parties' ability to target advertisements on other computing devices that a patient uses. This is called cross-device targeting.

216.    What this means is that third parties, including Facebook and Google, have established a unique identifier for a patient that ties together their desktop, laptop, and smartphone computing devices. Even if a patient has never visited the ProMedica web property on their smartphone, cross-device tracking and marketing is a method through which ProMedica and the third parties work together to target those patients on that device. For example, a patient or potential patient who had visited the ProMedica web property on his desktop, but never on his smartphone, could be targeted with the ad on their smartphone.

217.    Cross-device tracking illustrates that the data elements disclosed to the third parties are personally identifiable because they enable the tracking of patients across the multiple devices

that the patient owns, even when the patient has never communicated with ProMedica on one or more of their devices.

218.    ProMedica has determined that the targeted advertising (including retargeting and cross-device tracking) that is enabled by its disclosure of patient data and communications is of commercial benefit to ProMedica.

219.    Upon information and belief, ProMedica obtains additional revenue from its deployment of third-party tracking tools through which it discloses personally identifiable patient data and communications to third parties.

220.    Any additional revenue ProMedica obtains from its unauthorized use of its own patients' personally identifiable data and communications is unearned and the rightful property of the patients from whom it was obtained.

221.    ProMedica's unauthorized disclosure and use of Plaintiff's and other patients' personally identifiable data and communications is a form of theft, for which the victims are entitled to recover anything acquired with the stolen assets, even if the items acquired have a value that exceeds the value of that which was stolen.

## THE VALUE OF THE DATA PROMEDICA DISCLOSES

222.    The monetization of the data disclosed by ProMedica demonstrates the inherent value of such information.

223.    There is an active market for health information which is the subject of significant legal protections under HIPAA and Ohio law. Because of these protections, patient data is not generally known to or readily ascertainable by others who might otherwise obtain economic advantage from its use.

224.    The value of the data that companies like Facebook and Google extract is well understood and accepted in the modern economy.

225.    Personal information is now viewed as a form of currency and a corporate asset. Professor Paul M. Schwartz has noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.

226.    The cash value of Internet users' personal information can be quantified.

227.    For example, one 2015 study determined that Americans place more value on their "health condition" than any other piece of data about them, with a minimum value of $82.90.[13] By comparison, respondents assigned a value of $67.00 to their passwords, $55.70 to their Social Security number, and $40.10 to their credit history.

228.    Medical information derived from medical providers garner even more value from its scarcity, which is driven by the fact that it is not legally available to third-party data marketing companies because of strict restrictions on provider disclosures under HIPAA, state laws, and provider standards, including the Hippocratic Oath.

229.    Even with strict restrictions on the disclosure of personally identifiable health information, a robust market exists for the trade of de-identified health data.[14]

---

[13] Ponemon Institute, Privacy and Security in a Connected Life: A Study of US Consumers, March 2015, available at https://www.trendmicro.de/media/report/ponemon-privacy-and-security-in-a-connected-life-us-consumers-report-en.pdf.

[14] *See* How Data Brokers Make Money Off Your Medical Records, Scientific American, https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/; Your Private Medical Data is for Sale – and It's Driving a Business Worth Billions, The Guardian, https://www.theguardian.com/technology/2017/jan/10/medical-data-multibillion-dollar-business-report-warns; The Hidden Global Trade in Patient Medical Data, YaleGlobal Online, https://yaleglobal.yale.edu/content/hidden-global-trade-patient-medical-data.

230.     ProMedica's disclosures violate Plaintiff's and other patients' privacy rights not to have their personally identifiable patient data and communications disclosed without their knowledge, authorization, consent, or any further action on their part.

**PROMEDICA ASSURES PATIENTS THAT IT PROTECTS THEIR PERSONALLY IDENTIFIABLE AND NON-PUBLIC MEDICAL INFORMATION**

231.     A health care provider must obtain a patient's express written authorization to disclose and use personally identifiable information about patients for marketing purposes.

232.     Patients who exchange communications with Defendant at www.ProMedica.org and the ProMedica Patient Portal have a reasonable expectation that their communications will remain confidential.

233.     ProMedica does not make any disclosure on its website that would sufficiently alert patients that it discloses, and causes to be transmitted to third parties, patients' personally identifiable data, non-public medical information, and communications.

234.     To the contrary, ProMedica's various privacy statements reassure patients that their data is protected and confidential, and give patients the impression that its data practices at www.promedica.org and MyChart are "secure."

*ProMedica Notice of Privacy Practices*

235.     ProMedica provides patients with a Notice of Privacy Practices available at https://www.promedica.org/Pages/about-us/notice-of-privacy-practices.aspx.

236.    ProMedica's Notice starts with the assertion in bold caps that "We Have a Legal Duty to Protect Your Health Information":



237.    ProMedica does not disclose anywhere in its Notice that it deploys source code on its website that commandeers patient computing devices without patient knowledge or authorization to cause those devices to send non-public, personally identifiable medical information, and the precise contents of patient communications to third parties.

238.    Rather, ProMedica's Notice assures patients that "Before we use, disclose or sell your personal health information for any reason other than those reasons described in Section III.A and III.B, we will need to get your written authorization. If you authorize us to use or disclose your information, you can revoke your authorization by filling out the appropriate form."

239.    Patients are not presented with or asked to agree to this purported Privacy Policy.

240.    A health care provider's duty not to disclose non-public, personally identifiable medical information about patients to third parties for marketing purposes in the absence of the patient's express authorization is not subject to waiver via an inconspicuous browsewrap purported privacy policy.

241.    A patient's reasonable expectation that his/her health care provider will not share their information with third parties for marketing purposes, in the absence of their express authorization, is not subject to waiver via an inconspicuous browsewrap purported privacy policy.

242.    Browsewrap statements do not constitute enforceable contracts against consumers.

243.    The very term "Privacy" policy or statement is deceptive.

244.    Consumer surveys consistently show that a majority of Americans falsely believe that the existence of a privacy policy means that "the company keeps confidential all the information it collects on users."[15]

245.    Nevertheless, even if a browsewrap privacy policy could be legally sufficient, Defendant here made express and implied promises of confidentiality in its purported privacy statement that further patient expectations of privacy and assured patients that their personally identifiable data and communications would be kept confidential and secure.

### ProMedica Social Media Policies

246.    ProMedica also maintains "Social Media Policies" which relate to "our ProMedica web-based social networking platforms such as Facebook, blogs, or YouTube." That is, these policies relate to the conduct of ProMedica and its agents' use of social media platforms rather than the incorporation of social media web bugs on the ProMedica site itself.

247.    ProMedica does not disclose anywhere in its Social Media Policies that it deploys source code on its website that commandeers patient computing devices without patient knowledge or authorization to cause those devices to send non-public, personally identifiable medical information, and the precise contents of patient communications to third parties.

---

[15] Aaron Smith, Half of Americans Don't Know What a Privacy Policy Is, Pew Research Center (Dec. 4, 2014) (Reporting that more than half of Americans falsely believe, "When a company posts a privacy policy, it ensures that the company keeps confidential all the information it collects on users."), available at https://www.pewresearch.org/fact-tank/2014/12/04/half-of-americans-dont-know-what-a-privacy-policy-is/.

248.     Rather, ProMedica's Policies assure patients that "at ProMedica are committed to … [m]aintain[ing] patient confidentiality. We will not share patient information and will maintain compliance with HIPAA and policies related to patient health information, privacy, security and safety":



## CLASS ACTION ALLEGATIONS

249.     Plaintiff brings this class action pursuant to Ohio Civil Rule 23 and seeks certification of the claims on behalf of the following class (the "Class"):

> All Ohio residents who are, or were, patients of ProMedica or any of its affiliates, and who used ProMedica's web properties, including, but not limited to, www.promedica.org and the Patient Portal at MyChart.

250.     Plaintiff reserves the right to redefine the Class prior to certification.

251.     This action is properly maintainable as a class action.

252.     The Class members are identifiable.

253.     Plaintiff is a member of the Class.

254.     Defendant is one of the largest health systems in Ohio, performing approximately 4.7 million patient visits annually.[16] The Class for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable.

255.     The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, or by publication, the cost of which is properly imposed on Defendant.

---

[16] https://www.promedica.org/pages/about-us/default.aspx

256.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of other Class members and Plaintiff has the same interests as other Class members. Plaintiff has no interests antagonistic to or in conflict with the interests of the other members of the Class. Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

257.     The prosecution of separate actions by individual Class members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class not party to the adjudications.

258.     The expense and burden of individual litigation make it impracticable for members of the Class to redress the wrongs done to them individually. If a class action is not permitted, Class members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

259.     Plaintiff's claims arise from a practice which Defendant applies uniformly to all the similarly situated Class members and are based on the same legal theories as all other members of the putative class. Defendant has acted and refused to act on grounds generally applicable to the entire Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

260.     Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action.

261.     For the above reasons, a class action is superior to other available methods for the fair and efficient adjudication of this action.

262.    Because Defendant's conduct was and is uniform as to all Class members, the material elements of Plaintiff's claims and those of absent Class members are subject to common proof, and the outcome of Plaintiff's individual actions will be dispositive for the Class. Indeed, there are questions of law and fact common to Class members that predominate over any questions affecting only individual members of the Class. A class action will generate common answers to the below questions, which are apt to drive resolution:

a.  Whether Defendant's practices relating to its disclosures of the Class communications with Defendant to third-party companies attached to personal information was intentional;

b.  Whether Defendant's practices relating to its disclosures of the Class communications with Defendant to third-party companies attached to personally identifiable information constituted a breach of provider-patient confidentiality;

c.  Whether this case may be maintained as a class action;

d.  Whether and to what extent Class members are entitled to damages and other monetary relief;

e.  Whether and to what extent Class members are entitled to equitable relief including, but not limited to, a preliminary and/or permanent injunction; and

f.  Whether and to what extent Class members are entitled to attorneys' fees and costs.

## COUNT I – DISCLOSURE NON-PUBLIC MEDICAL INFORMATION PURSUANT TO *BIDDLE V. WARREN GEN. HOSP.*, 86 OHIO ST.3D 395 (1999)

263.    Plaintiff incorporates all prior paragraphs as if fully stated herein.

264.    In Ohio, medical providers have an obligation to their patients to keep non-public medical information completely confidential.

265.    Disclosure of confidential medical information by a medical provider in Ohio without consent results in civil liability.

266.    Plaintiff is a patient of ProMedica.

267.    Plaintiff has reasonable expectations of privacy in his communications exchanged with ProMedica, including communications exchanged at www.promedica.org on the log-in page for the ProMedica Patient Portal, and within the MyChart patient portal.

268.    Plaintiff's reasonable expectations of privacy in the communications exchanged with ProMedica were further buttressed by ProMedica's express promises including, but not limited to, "Before we use, disclose or sell your personal health information for any reason other than those reasons described in Section III.A and III.B, we will need to get your written authorization. If you authorize us to use or disclose your information, you can revoke your authorization by filling out the appropriate form."

269.    Contrary to its obligations as a provider and its express promises of confidentiality, ProMedica deployed source code to disclose and transmit Plaintiff's personally identifiable, non-public medical information, and the contents of their communications exchanged with ProMedica to numerous third parties.

270.    The third-party recipients to whom ProMedica disclosed Plaintiff's personally identifiable, non-public medical information, and communications include Facebook, Google, Microsoft (Bing), and Quantcast.

271.    ProMedica's disclosures of Plaintiff's personally identifiable, non-public medical information, and the contents of their communications with ProMedica were made without his knowledge, consent, or authorization, and were unprivileged.

272.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the health care provider and the patient.

273.     As a direct and proximate cause of ProMedica's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Defendant caused Plaintiff and other patients the following damages:

a.      Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b.      ProMedica eroded the essential confidential nature of the provider-patient relationship;

c.      General Damages for invasion of their rights in an amount to be determined by a jury;

d.      Nominal Damages for each independent violation;

e.      ProMedica took something of value from Plaintiff and Class members and derived benefit therefrom without Plaintiff's and Class members' knowledge or informed consent and without compensating Plaintiff for the data;

f.      Plaintiff and Class members did not get the full value of the medical services for which they paid, which included ProMedica's duty to maintain confidentiality;

g.      ProMedica's actions diminished the value of Plaintiff's and Class members' personal information; and

h.      ProMedica's actions violated the property rights Plaintiff and Class members have in their personally identifiable medical information and the content of their communications.

## COUNT II – BREACH OF CONFIDENCE

274.     Plaintiff incorporates all prior paragraphs as if fully stated herein.

275.     In Ohio, medical providers have a duty to their patients to keep non-public medical information completely confidential.

276.     Disclosure of confidential medical information by a medical provider in Ohio without consent results in civil liability.

277.     Plaintiff is a patient of ProMedica.

278.    Plaintiff has reasonable expectations of privacy in his communications exchanged with ProMedica, including communications exchanged at www.promedica.org on the log-in page for the ProMedica Patient Portal, and within the MyChart patient portal.

279.    Plaintiff's reasonable expectations of privacy in the communications exchanged with ProMedica were further buttressed by ProMedica's expresses promises including, but not limited to, "Before we use, disclose or sell your personal health information for any reason other than those reasons described in Section III.A and III.B, we will need to get your written authorization. If you authorize us to use or disclose your information, you can revoke your authorization by filling out the appropriate form."

280.    Contrary to its duties as a medical provider and its express promises of confidentiality, ProMedica deployed source code to disclose and transmit Plaintiff's personally identifiable, non-public medical information, and the contents of their communications exchanged with ProMedica to numerous third parties.

281.    The third-party recipients to whom ProMedica disclosed Plaintiff's personally identifiable, non-public medical information, and communications include Facebook, Google, Microsoft (Bing), and Quantcast.

282.    ProMedica's disclosures of Plaintiff's personally identifiable, non-public medical information, and the contents of their communications with ProMedica were made without his knowledge, consent, or authorization, and were unprivileged.

283.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the health care provider and the patient.

284.    As a direct and proximate cause of ProMedica's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class members were damaged by ProMedica's breach in that:

    a.    Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

    b.    ProMedica eroded the essential confidential nature of the provider-patient relationship;

    c.    General Damages for invasion of their rights in an amount to be determined by a jury;

    d.    Nominal Damages for each independent violation;

    e.    ProMedica took something of value from Plaintiff and Class members and derived benefit therefrom without Plaintiff's and Class members' knowledge or informed consent and without compensating Plaintiff for the data;

    f.    Plaintiff and Class members did not get the full value of the medical services for which they paid, which included ProMedica's duty to maintain confidentiality;

    g.    ProMedica's actions diminished the value of Plaintiff's and Class members' personal information; and

    h.    ProMedica's actions violated the property rights Plaintiff and Class members have in their personally identifiable medical information and the content of their communications.

## COUNT III – INVASION OF PRIVACY – INTRUSION UPON SECLUSION

285.    Plaintiff re-states all previous allegations as if stated fully herein.

286.    Plaintiff and Class members have objectively reasonable expectation of solitude or seclusion in their personal and private information and the confidentiality of the content of their communications with their medical provider.

287.    ProMedica intruded upon that seclusion by deploying source code at its web properties that caused Plaintiff and other patient Class members' private information and

communications to be disclosed to third parties for marketing purposes without patient knowledge, authorization, consent, notice, or privilege.

288.    ProMedica's actions of disclosing its own patients' private information and the content of communications that patients exchanged with ProMedica under reasonable expectations of privacy and ProMedica's express promise to maintain confidentiality would be highly offensive to a reasonable person.

289.    ProMedica's breach caused Plaintiff and other patients the following damages:

a.    Confidential information that Plaintiff and Class members intended to remain private is no more, the highly offensive breach of which entitles Plaintiff and other patients to General Damages for the tort of intrusion upon seclusion;

b.    ProMedica took something of value from Plaintiff's and Class members and derived benefit therefrom without Plaintiff's and Class members knowledge or informed consent and without sharing the benefit of such value;

c.    Plaintiff and Class members did not get the full value of the medical services for which they paid, i.e. benefit of the bargain, which included ProMedica's duty to maintain confidentiality; and

d.    ProMedica eroded the essential confidential nature of the provider-patient relationship.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, asked for judgment in their favor, and that the Court award:

a.    General Damages for the violation of privacy in an amount to be determined by a jury without reference to specific harm;

b.    A reasonable royalty for ProMedica's misappropriation of personally identifiable, non-public medical information, and communications;

c.    Imposition of a constructive trust against ProMedica through which Plaintiff can be compensated for any unjust enrichment gained by ProMedica;

d.     The value of the data ProMedica disclosed and used without Plaintiff's and other

patients' authorization;

e.     Attorneys' fees and litigation costs reasonably expended; and

f.     Punitive damages in an amount to be determined by a jury.

In addition, Plaintiff, on behalf of himself and all others similarly situated, respectfully request this Court enter an order for equitable relief, enjoining ProMedica from making any further disclosures of Plaintiff's or Class members' communications with ProMedica.

## DEMAND FOR JURY TRIAL

Plaintiff hereby makes a demand for trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Stuart E. Scott*
Stuart E. Scott (0064834)
Kevin C. Hulick (0093921)
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (FAX)
sscott@spanglaw.com
khulick@spanglaw.com

Mitchell Breit (*pro hac vice* to be submitted)
Jason 'Jay' Barnes (*pro hac vice* to be submitted)
**SIMMONS HANLY CONROY LLC**
112 Madison Avenue, 7th Floor
New York, NY  10016-7416
(212) 784-6400
(212) 213-5949 (FAX)
mbreit@simmonsfirm.com
jaybarnes@simmonsfirm.com

***Counsel for Plaintiff and the Proposed Class***