## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

JOHN DOE,

               Plaintiff,

     v.

PROMEDICA HEALTH SYSTEM, INC.,

           Defendant.

CASE NO. 3:20-cv-01581-JZ

JUDGE JACK ZOUHARY

MAGISTRATE JUDGE JAMES R. KNEPP, II

## DEFENDANT PROMEDICA HEALTH SYSTEM, INC.'S
## OPPOSITION BRIEF TO PLAINTIFF'S MOTION TO REMAND

## TABLE OF CONTENTS

Page

A.    A Contract Is Not Required for Federal Officer Removal. ............................1

B.    An Executive Order Supports Federal Officer Removal. ................................3

C.    The Federal Mission to "Improve Health and Health Care for All Americans Through the Use of Information and Technology.".......................5

D.    The "Acting Under" and "Related To" Requirements for Federal Officer Removal Are Both Met Here. ..................................................................7

E.    ProMedica's Defenses to Plaintiff's Claims Raise Important Federal Questions that a Federal Court Should Decide. .............................................13

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
2020 WL 365617 (N.D. Fla. Jan. 22, 2020) ............................................................................2

*In re 3M Combat Arms Earplug Products Liab. Litig.*,
2020 WL 4275646 (N.D. Fl. Jul. 24, 2020) ............................................................................1

*Baker v. Atl. Richfield Co.*,
962 F.3d 937 (7th Cir. 2020) .........................................................................................8, 12

*Baran v. ASRC Fed. Mission Solutions*,
2018 WL 3054677 (D.N.J. Jun. 20, 2018) .............................................................................4

*Bennett v. MIS Corp.*,
607 F.3d 1076 (6th Cir. 2010) ....................................................................................10, 11

*Betzner v. Boeing Co.*,
910 F.3d 1010 (7th Cir. 2018) ..............................................................................................8

*Butler v. Coast Elec. Power Ass'n*,
926 F.3d 190 (5th Cir. 2019) .........................................................................................5, 13

*Caver v. Cent. Al. Elec. Coop.*,
845 F.3d 1135 (11th Cir. 2017) .....................................................................................4, 5

*Cessna v. Rea Ener. Coop., Inc.*,
753 F. App'x 124 (3d Cir. 2018) .........................................................................................5

*Dart Cherokee Basin Operating Co., LLC v. Owens*,
574 U.S. 81 (2014).................................................................................................................8

*Graiser v. Visionworks of Am.*,
819 F.3d 277 (6th Cir. 2016) .............................................................................................11

*Halsey v. AGCO Corp.*,
755 F. App'x 524 (6th Cir. 2019) ........................................................................................8

*Isaacson v. Dow Chem. Co.*,
517 F.3d 129 (2d Cir. 2008).................................................................................................9

*Jane Doe I v. UPMC*,
2020 WL 4381675 (W.D. Pa. Jul. 31, 2020) ................................................................7, 10

*Latiolais v. Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020) (en banc) ...................................................12, 13

*Mays v. City of Flint, Mi.*,
   871 F.3d 437 (6th Cir. 2017) .........................................................................10

*Murphy v. Nat'l Coll. Ath. Ass'n*,
   138 S. Ct. 1461 (2018)....................................................................................15

*In re Nat'l Prescription Opiate Litig.*,
   327 F. Supp. 3d 1064 (N.D. Ohio 2018)........................................................11

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982).........................................................................................3

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*,
   647 F. App'x 619 (6th Cir. 2016) ..................................................................10

*Papp v. Fore-Kast Sales Co.*,
   842 F.3d 805 (3d Cir. 2016)............................................................................7

*Sember v. Booz Allen Hamilton Eng. Servs., LLC*,
   2017 WL 990228 (S.D. Ohio Mar. 15, 2017).................................................4

*Smith v. Facebook*,
   262 F.Supp.3d 943 (N.D.Cal.2017), *aff'd* 745 F.App'x 8 (9th Cir.2018) .............................15

*Stephenson v. Nassif*,
   160 F. Supp. 3d 884 (E.D. Va. 2015) ...........................................................3, 4

*United States Dep't of the Navy v. Fed. Labor Rel. Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012) .......................................................................9

*United States v. Rodriguez*,
   797 F. App'x 933 (6th Cir. 2019) ....................................................................9

*Watson v. Philip Morris Cos.*,
   551 U.S. 142 (2007)...............................................................................2, 3, 7, 10

*Willingham v. Morgan*,
   395 U.S. 402 (1969).................................................................................2, 10

## Statutes

28 U.S.C. § 1442..................................................................................... 1-3, 8

42 U.S.C. § 300jj-11 ..................................................................................6

42 U.S.C. § 300jj-12 ..................................................................................6

42 U.S.C. § 1320d-2 ...........................................................................................................14

42 U.S.C. § 1395w-4 ...........................................................................................................6

**Rules**

Fed. R. Civ. Pro. Rule 8 ......................................................................................................8

**Other Authorities**

42 C.F.R. § 495.20 ......................................................................................................6, 9, 12

42 C.F.R. § 495.22 ...............................................................................................................6

42 C.F.R. § 495.24 ...............................................................................................................7

42 C.F.R. § 495.40 .............................................................................................................10

45 C.F.R. § 160.103 .....................................................................................................14, 15

75 Fed. Reg. 144 ............................................................................................................6, 7

EXECUTIVE ORDER NO. 13,335 ...........................................................................................5

EXECUTIVE ORDER NO. 7,307 .............................................................................................4

14C Fed. Prac. & Proc. Juris. § 3726 ..................................................................................3

In 2004, the federal government embarked on a federal mission to make electronic health records available to every health care patient in the country. Defendant ProMedica Health System, Inc. assisted the federal government in carrying out this federal mission by creating a MyChart patient portal for its patients, and included a link to this patient portal on ProMedica's website. In this case, ProMedica faces liability precisely because of that action taken under color of federal law, and precisely because of that link to the patient portal on ProMedica's website. Removal to this Court is therefore appropriate under 28 U.S.C. § 1442(a). In arguing against this common-sense analysis, plaintiff attempts to create artificial distinctions to federal officer removal that are nowhere to be found in the text of the statute itself or in the federal case law interpreting that text. ProMedica addresses each of these arguments in turn; as an initial matter, we frame the response to these arguments through the lens of the two questions the Court asked at the parties' initial status conference: (1) Is a contract required for federal officer removal?; and (2) Is an executive order enough on its own for federal officer removal?

## A.    A CONTRACT IS NOT REQUIRED FOR FEDERAL OFFICER REMOVAL.

At the parties' initial status conference plaintiff agreed that a government contract was not necessary for federal officer removal. In their motion, however, plaintiff appears to backtrack from this position, relying on *In re 3M Combat Arms Earplug Products Liab. Litig.*, 2020 WL 4275646 (N.D. Fl. Jul. 24, 2020), for the proposition that "[w]ithout a contract, there is no government contractor removal." (D.E. 14-1, Mem. in Supp. 4; *see also id.* at 2, 6 (seeming to argue the same).)

The decision in *In re 3M* addressed a separate question: whether a defendant who was not acting pursuant to a contract with the federal government when designing earplugs for the military could nonetheless take advantage of the federal contractor defense. *See In re 3M*, 2020 WL 4275646, at *9-10. On summary judgment, the court held that this defendant could not. *Id.* at *10. More on point to this case, the court in *3M* had initially denied 341 motions to remand under the

1

federal officer removal statute, because the defendant had raised a colorable federal defense and shown it was acting for the federal government in designing the earplugs in the first instance. *See In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2020 WL 365617, at *1, 3-4 (N.D. Fla. Jan. 22, 2020) (holding the acting under requirement is met "where a plaintiff's allegations are directed at the relationship between the defendant and the government") (quotation omitted).

There is good reason plaintiff could not find a single case to support this position: plaintiff's argument is foreclosed by the text of 28 U.S.C. § 1442(a)(1) and by Supreme Court precedent interpreting this text. The statutory text allows for removal of any case to federal court where "the United States," or "any agency thereof," or "any officer," or "any person acting under that officer," is sued in state court, under state law claims, "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). This language, as the Supreme Court has held, "is not 'narrow' or 'limited,'" *Willingham v. Morgan*, 395 U.S. 402, 406 (1969), but instead is "broad," and thus also "must be liberally construed." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

In *Watson*, the Court held that "the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Id.* at 151 (18 Ox. Eng. Dict. 948 (2d ed. 1989)). That relationship "typically involves 'subjection, guidance, or control.'" *Id.* (Webster's New Int'l Dict. 948 (2d ed. 1953)). "In addition," the Court held, "precedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal supervisor." *Id.* at 152. The only limitation that the Court placed on this holding was that mere compliance with the law, even a detailed regulatory regime, was not sufficient to support federal office removal: "the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law." *Id.* (emphases in original).

2

Under *Watson*, then, it is clear that there does not need to be a contract for federal officer removal. Instead, there must be some element—whether this be "any contract," *or* "any payment," *or* "any employer/employee relationship," *or* "any principal/agent arrangement," *or* any other "evidence of any delegation of legal authority"—that raises the relationship above mere compliance with the law. *Id.* at 151-52. As Professors Wright & Miller have noted, the statute has "been applied in cases involving a wide spectrum of civil and criminal substantive contexts, and the right to remove has been invoked by a tremendous variety of federal officers and persons acting under the direction of federal officers." 14C Fed. Prac. & Proc. Juris. § 3726 (Rev. 4th ed.).

### B.     AN EXECUTIVE ORDER SUPPORTS FEDERAL OFFICER REMOVAL.

The second question the Court asked at the parties' initial status conference was whether or not acting pursuant to an executive order alone could justify federal officer removal. We have not seen a case addressing this precise question. However, numerous cases have allowed for federal officer removal in the context of federal programs initially formed by the President exercising the executive authority. *Cf. Nixon v. Fitzgerald*, 457 U.S. 731, 749-50 (1982) (Article II of the Constitution "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity").

In *Stephenson v. Nassif*, 160 F. Supp. 3d 884 (E.D. Va. 2015), for example, plaintiff sued the defendant sued under state employment law for filing a red flag report against him under Department of Defense regulations on the protection of classified information, which had been issued pursuant to Executive Order. *Id.* at 886, 888. The court held that "it is pellucid that the broad language of § 1442(a)(1) must be applied in a manner that effectuates the central congressional policy of securing a federal forum for persons who assist the federal government in a manner that risks the imposition of state law liability." *Id.* at 888. Thus, "[t]he principles of *Watson*, applied

here, point persuasively to the conclusion that defendant Alliance was 'acting under' a federal officer when it submitted the JPAS incident report concerning plaintiff." *Id.*

*Stephenson* is not alone in making this holding; the Southern District of Ohio has also allowed removal under these same Department of Defense regulations. *See Baran v. ASRC Fed. Mission Solutions*, 2018 WL 3054677, at *5-6 (D.N.J. Jun. 20, 2018), *aff'd* --- F. App'x ----, 2020 WL 2551871, at *2 (3d Cir. May 20, 2020) ("The National Industrial Security Program Operating Manual ('NISPOM'), issued by the Secretary of Defense pursuant to Executive Order, requires contractors with access to classified information to report in JPAS 'adverse information coming to their attention concerning any of their cleared employees.") (quotation omitted); *Sember v. Booz Allen Hamilton Eng. Servs., LLC*, 2017 WL 990228, at *4 (S.D. Ohio Mar. 15, 2017) (same; "Defendants were acting under the direction of a 'federal officer' because they were required by law to report Sember's conduct to the DoD under NISPOM § 1-302(a).").

Another group of cases where this same issue arose is in the context of a series of putative class action lawsuits filed under state law against rural electricity cooperatives. "In 1935, during the Great Depression, President Franklin D. Roosevelt, through an executive order, created the Rural Electrification Administration ('REA') '[t]o initiate, formulate, administer, and supervise a program of approved projects with respect to the generation, transmission, and distribution of electric energy in rural areas.'" *Caver v. Cent. Al. Elec. Coop.*, 845 F.3d 1135, 1138 (11th Cir. 2017) (quoting Executive Order No. 7,307). The following year Congress passed the Rural Electrification Act of 1936, which "affirmed the creation of the REA and authorized the REA to make loans for rural electrification and the furnishing of electric energy to persons in rural areas." *Id.* (quotation omitted). And three circuit courts of appeals to analyze the issue have each held that claims challenging a rural electric cooperative's alleged failure to make distributions under state

law are appropriately removable to federal court. As the Eleventh Circuit held in *Caver*: "Quite simply the REA was designed to guide and control the process of bring electricity to sparsely populated rural areas that would not otherwise receive electricity." 845 F.3d at 1143-44; *see also Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 201 (5th Cir. 2019); *Cessna v. Rea Ener. Coop., Inc.*, 753 F. App'x 124, 127 (3d Cir. 2018) (both holding same).

Thus, the presence of an executive order is an important fact for the Court to consider in ruling on plaintiff's remand motion, particularly where this order is subsequently affirmed through Congressional action. *Caver*, 845 F.3d at 1143 ("Congress and the President designed a system by which the REA would accomplish these goals by loaning money to state entities, which would carry out these objectives under the REA's close supervision").

### C.     THE FEDERAL MISSION TO "IMPROVE HEALTH AND HEALTH CARE FOR ALL AMERICANS THROUGH THE USE OF INFORMATION AND TECHNOLOGY."

In this case, removal under the federal officer statute is appropriate because plaintiff's complaint directly challenges actions that ProMedica took while acting under color of federal law, by creating an electronic health record patient portal to assist the federal government in carrying out its federal mission to create a unified system for patient electronic health records.

Specifically, in 2004, President Bush ordered the Secretary of the Department of Health and Human Services to "establish within the Office of the Secretary the position of National Health Information Technology Coordinator." (Exec. Ord. 13,335, Ex. A.) Under the Executive Order, "[t]he National Coordinator shall, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." (*Id.* at § 3.)

Congress then passed the Health Information Technology Act (HITECH Act) in 2009, which codified the Office of the National Coordinator for Health Information Technology, *see* 42 U.S.C. § 300jj-11(a), and required the National Coordinator to "review and determine whether to endorse each standard, implementation specification, and certification criterion for the electronic exchange and use of health information that is recommended by the HIT Advisory Committee under section 300jj-12 of this title for purposes of adoption under section 300jj-14 of this title," *id.* at (c); *see also* 42 U.S.C. § 300jj-12 (establishing Health Information Technology Advisory Committee). At the same time, Congress codified a series of incentive payments for the federal government to make to health care providers for their adoption of health information technology, including through the Medicare program. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); *see* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (Cong. Res. Serv. Apr. 27, 2009) (discussing various financial incentives; "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs.").

The following year, the Department of Health and Human Services adopted the Meaningful Use regulations. *See* 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). In introducing the final regulations the Department stated: "Certified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.*, 44321. The Department adopted a "phased approach" to the Meaningful Use regulations, with three stages. *See* 42 C.F.R. § 495.20 (Meaningful use objectives and measures for EPs, eligible hospitals, and CAHs before 2015); 42 C.F.R. § 495.22

(same for 2015 through 2018); 42 C.F.R. § 495.24 (Stage 3 meaningful use objectives for 2019 and subsequent years). Stage one "focuses heavily on establishing the functionalities in certified EHR technology that will allow for continuous quality improvement and ease of information exchange." 75 Fed. Reg. 144, 44321. "Increasingly robust expectations for health information exchange in stage two and stage three will support and make real the goal that information follows the patient." *Id.* As the Office of National Coordinator stated at the time: "[T]he government is pursuing a vision of a learning health system, in which a vast array of health care data can be appropriately aggregated, analyzed, and leveraged using real-time algorithms and functions." (Ex. B, *2011-2015 Fed. Health Info. Strategic Plan* at 5.) This strategic plan included both a "Federal Health IT Vision and Mission": "Vision: A health system that uses information to empower individuals and to improve the health of the population. Mission: To improve health and health care for all Americans through the use of information and technology." (*Id.*, Ex. B at 6.)

### D. THE "ACTING UNDER" AND "RELATED TO" REQUIREMENTS FOR FEDERAL OFFICER REMOVAL ARE BOTH MET HERE.

ProMedica acted in response to this federal command. As relevant to this brief, ProMedica gave its patients the opportunity to create and maintain their own personal electronic health record with ProMedica through MyChart, a patient portal. (D.E. 1, Not. of Rem. ¶¶ 4, 10-11, 17, 27, 29; D.E. 1-1, Compl. ¶¶ 4, 12, 39; https://mychart.promedica.org/MyChart/Authentication/Login?); *see also Jane Doe I v. UPMC*, 2020 WL 4381675, at *5-6 (W.D. Pa. Jul. 31, 2020) (denying motion to remand a nearly verbatim complaint to state court on this basis). As the court held in *UPMC*: "The fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network shows the relationship between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*." *Id.* at *6 (citing *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813

7

(3d Cir. 2016) ("Papp's allegations are directed at actions Boeing took while working under a federal contract to produce an item the government need, to wit, a military aircraft")).

Plaintiff's motion presents a series of arguments as to why this Court should split with the Western District of Pennsylvania in deciding this exact same question. None of these arguments have merit; each will be addressed in turn:

*First*, plaintiff argues ProMedica was required to provide evidence in its notice of removal to show how the federal government specifically managed ProMedica's patient portal. (Mem. 6.) The Supreme Court has made plain that a notice of removal, like a complaint, does not have to be supported by evidence. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) (holding that "Congress, by borrowing the familiar 'short and plain statement' standard from Rule 8(a), intended to simplify the pleading requirements for removal and to clarify that courts should apply the same liberal rules to removal allegations that are applied to other matters of pleading"). A defendant thus does not encounter a "daunting burden" in removing the case, *see Halsey v. AGCO Corp.*, 755 F. App'x 524, 527 (6th Cir. 2019), including in particular with respect to the federal officer removal statute, *see Betzner v. Boeing Co.*, 910 F.3d 1010, 1014 (7th Cir. 2018) (holding that "the standard in assessing removal allegations under § 1442(a) starts with Rule 8(a)'s short and plain statement requirement"). To the extent the Court feels evidence does need to be presented, now that jurisdiction has been challenged, *see Dart Cherokee*, 574 U.S. at 89, attached to this brief is the Declaration of Debi Brobst, Chief Information Officer for ProMedica Health System, describing ProMedica's participation in the Meaningful Use Program specific with respect to the MyChart patient portal. (Ex. C, Debi Brobst Decl. ¶¶ 2-5.)

*Second*, plaintiff argues the MyChart patient portal cannot support removal because participation in the program was "voluntary." (Mem. 2.) Courts have rejected the notion that the

voluntary nature of federal assistance should guide the removal analysis. *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (rejecting district court holding that "mere assistance, in the absence of a legal duty to render such aid, does not bestow § 1442 jurisdiction"; "Like the Second Circuit, we 'find no authority for the suggestion that a voluntary relationship somehow voids the application of the removal statute.'") (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008)); *In re Commw.'s Mot. to Appt. Counsel*, 790 F.3d 457, 469-70 (3d Cir. 2015) (allowing removal of claims related to federal public defender's voluntary assistance of defendants in state court habeas proceedings). In any event, stating participation in the meaningful use program was voluntary is a misnomer. As the Sixth Circuit has recognized: "[T]he power of the purse is the power to control." *U.S. v. Rodriguez*, 797 F. App'x 933, 937 (6th Cir. 2019); *U.S. Dep't of the Navy v. Fed. Labor Rel. Auth.*, 665 F.3d 1339, 1346-47 (D.C. Cir. 2012) ("The power over the purse was one of the most important authorities allocated to Congress in the Constitution's necessary partition of power among the several departments.") (quotation omitted).

*Third*, plaintiff argues the MyChart patient portal cannot support removal because the Meaningful Use program did not involve any federal supervision or control. (Mem. 2.) The Department of Health and Human Services' regulations speak for themselves on these points. The regulations exhaustively detail all of the meaningful use requirements in painstaking detail, including with respect to the requirements for the use of electronic health records. *See, e.g.,* 42 C.F.R. § 495.20(f)(12)(i)(B) (Objective) ("Beginning in 2014, provide patients with the ability to view online, download, and transmit information about a hospital admission."); *id.* at (ii)(B) (Measure) (health care provider must attest that "more than 50 percent of all unique patients who are discharged from the inpatient or emergency department of an eligible hospital or CAH have their information available online within 36 hours after discharge"). These regulations have

9

changed over time, but the one constant that has remained is required certification by the federal government with respect to every meaningful use requirement. 42 C.F.R. § 495.40 (Demonstration of meaningful use criteria). Thus, while plaintiff argues that ProMedica failed to allege that the government was "even aware" of its MyChart patient portal (Mem. 6), the regulations required ProMedica to provide annual reports regarding the meaningful use requirements in order to receive incentive reimbursements—which ProMedica did. (Ex. C, Brobst Decl. ¶ 4.)

*Fourth*, plaintiff argues the Court should not follow *UPMC* because Sixth Circuit case law on federal officer removal is different than Third Circuit case law. (Mem. 9-10.) This is a federal statute that has been interpreted by the Supreme Court on this precise language. *Watson*, 551 U.S. at 151-52. Thus, there can be no circuit split; there is only different case law decided on its own unique facts analyzing whether or not removal is appropriate under *Watson*. *Cf. Mays v. City of Flint, Mi.*, 871 F.3d 437, 445 (6th Cir. 2017) (refusing to allow removal by state officers for alleged state law violations in enforcing state environmental laws; "[w]here, as here, a state agency is sued based on state-law tort claims for actions taken while enforcing the State's own statutes and regulations, we see no need for federal officer removal"); *Oh. St. Chiro. Ass'n v. Hum. Hth. Plan Inc.*, 647 F. App'x 619, 622 (6th Cir. 2016) (refusing to allow removal of contract dispute related to privately-offered Medicare Advantage insurance plans); *with Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 (6th Cir. 2010) (allowing removal where "MIS helped FAA officers carry out their task of ridding a federal employee occupied building of an allegedly hazardous contaminant").

Plaintiff is correct that the *Mays* opinion cited to the general anti-removal presumption in its background. 871 F.3d at 442. This dicta citation was not necessary to the court's holding and could not overrule Supreme Court precedent in any event. *Willingham*, 395 U.S. at 406 (statute "is not 'narrow' or 'limited'"); *Watson*, 551 U.S. at 147 ("broad" and "must be liberally construed").

10

Even following *Mays* courts in this district have continued to maintain that "the Sixth Circuit has endorsed 'the broad scope of the federal officer removal statute,' and thus this Court interprets the statute broadly in favor of removal in this instance." *In re Nat'l Pres. Op. Litig.*, 327 F. Supp. 3d 1064, 1069 (N.D. Ohio 2018) (quoting *Bennett*, 607 F.3d at 1084); *see also Graiser v. Visionworks of Am.*, 819 F.3d 277, 287 (6th Cir. 2016) (recognizing that "[f]ederal jurisdiction under CAFA, like federal jurisdiction over federal officers, serves different policy purposes than federal jurisdiction over ordinary diversity cases or cases arising under federal-question jurisdiction").

*Fifth*, plaintiff argues removal is inappropriate because the federal government would never "create its own federally operated patient portal to house medical records for ProMedica patients." (Mem. 7.) This statement severely undermines the extent of the federal interest at stake. "The U.S. Department of Health and Human Services has a critical responsibility to advance the connectivity of electronic health information and interoperability of health information technology (health IT)." (Ex. D at 1, *A 10-Year Vision to Achieve an Interoperable Health IT Infrastructure*.) "This is consistent with its mission to protect the health of all Americans to provide essential human services, especially for those who are least able to help themselves." (*Id.*) Moreover, the government spent $1.2 *trillion* on health care in 2019. https://www.taxpolicycenter.org/briefing-book/how-much-does-federal-government-spend- health-care. Health IT also "will support more efficient and effective systems." (Ex. D, *10-Year Vision* at 1.) Thus, there is substantial incentive for the government to come up with its own system for electronic health records. In co-opting private actors, the government simply found a different way to do the same job. (Ex. E, *2015-2020 ONC Strategic Plan* at 4 ("[T]his is a shared undertaking. Efforts of state, territorial, local, and tribal governments, and private stakeholders are vital to ensure that health information is available when and where it matters most to improve and protect people's health and well-being.").)

*Sixth*, and finally, plaintiff argues removal is inappropriate because ProMedica has not alleged a federal officer specifically directed ProMedica to "deploy source code" on its website. (Mem. 8, 11.) Plaintiff's argument overstates the requirements for federal officer removal. As the Seventh Circuit recently held, "[i]t is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship between the Companies and the federal government." *Baker*, 962 F.3d at 944-45. Thus, "the Companies did not need to allege that the complained-of conduct *itself* was at the behest of a federal agency." *Id.* (emphasis in original). Moreover, Congress recently amended the federal officer removal statute in 2011 to broaden the scope of removable claims, by adding the "related to" language. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291-92 (5th Cir. 2020) (en banc). Through this statutory amendment, "Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Id.* at 292 (emphasis in original); *see also id.* at 296 (same).

There can be no question that this connected to or associated with requirement is met here. Plaintiff's patient portal allegations are at the heart of this case. Plaintiff alleges that "ProMedica maintains a web property at www.promedica.org *and an online patient portal*[.]" (D.E. 1-1, Compl. ¶ 4; *id.*, ¶ 39 (same).) Plaintiff claims that the very existence of this online patient portal violates state and federal law, because "ProMedica uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, *including patient communications within the Patient Portal and on the patient portal log-in page*[.]" (*Id.*, ¶ 107.) Plaintiff claims these alleged disclosures are wrongful even before an individual is within the portal itself; her theory applies "regardless of whether such communications occurred before or after Plaintiff or patients had signed into MyChart." (*Id.*, ¶ 201.) Plaintiff seeks to represent a putative class consisting of "[a]ll Ohio residents who are, or

12

were, patients of ProMedica or any of its affiliates, and who used ProMedica's web properties, including, but not limited to, www.promedica.org *and the Patient Portal at MyChart*." (*Id.*, ¶ 249.) Removal is thus appropriate here because ProMedica was acting under color of federal law in making a patient portal available to its patients, and plaintiff's allegations against ProMedica directly relate to the mere presence of a link to this patient portal on ProMedica's website. As the Western District of Pennsylvania held in *Doe*: "There is plainly a connection between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability." 2020 WL 4381675, at *6.

### E.  PROMEDICA'S DEFENSES TO PLAINTIFF'S CLAIMS RAISE IMPORTANT FEDERAL QUESTIONS THAT A FEDERAL COURT SHOULD DECIDE.

The main purpose of the federal officer removal statute is to ensure that important federal defenses to an alleged state law liability claim are heard and decided by a federal court. *See, e.g., Butler*, 926 F.3d at 195 (goal of federal officer removal statute is "to give federal officers and those acting under them a federal forum in which to assert federal defenses"); *Mesa v. California*, 489 U.S. 121, 126-27 (1989) (analyzing colorable federal defense requirement).

These federal defenses abound in this case. Most basically, plaintiff alleges that searches made on a publicly available website are subject to HIPAA's privacy requirements, at least where that website is operated by a HIPAA-covered entity. (Compl. ¶¶ 17-20, 81(a)-(c) ("Ohio has adopted the HIPAA definitions in Ohio Rev. Code § 3798.04").) Plaintiff's motion proceeds from this same premise, as if the proposition were not even subject to debate. (Mem. 13-14.) This is far from being true. In fact, the type of health information Congress intended to protect through HIPAA is limited: health information submitted to health care providers and health plans only in connection with certain "administrative and financial" transactions. 42 U.S.C. § 1320d-2(a). These transactions are detailed in the statute: "[h]ealth claims or equivalent encounter

13

information; [h]ealth claims attachments; [e]nrollment or disenrollment in a health plan; [e]ligibility for a health plan; [h]ealth care payment and remittance advice; [h]ealth plan premium payments; [f]irst report of injury; [h]ealth claim status; [r]eferral certification and authorization." *Id.* HHS's final regulations contain these same "transactional" limitations. *See* 45 C.F.R. § 160.103 (defining term "covered entity" to mean "[a] health care provider who transmits any health information in electronic form *in connection with a transaction covered by this subchapter*").

Plaintiff's complaint against ProMedica does not involve any covered administrative or financial transaction. Rather, plaintiff's claims are that ProMedica allegedly disclosed protected health information to Facebook and Google when visitors to its website searched for information, or participated in certain health assessments, all of which were available not only to ProMedica patients, but to any member of the general public visiting ProMedica's website. (Compl. ¶¶ 267, 269-70; *id.*, ¶¶ 278, 280-81; *id.*, ¶¶ 287-88.) This includes specifically with respect to the patient portal, where plaintiff alleges that the mere clicking on the link to the portal necessarily discloses protected health information to Facebook, regardless of whether or not the individual even logs in. (*Id.*, ¶¶ 201, 267, 278.) Thus, a substantial and important question of federal law that *this* Court should consider is whether HIPAA even applies to internet searches made on a health care provider's publicly available website in the first instance. Moreover, and even if so, whether the type of Internet metadata that forms the basis for plaintiff's complaint would also constitute protected health information under the HIPAA regulations. *See Smith v. Facebook*, 262 F.Supp.3d 943, 955 (N.D.Cal.2017), *aff'd* 745 F.App'x 8 (9th Cir.2018) (rejecting argument that HIPAA applied to internet metadata because "[t]he same pages are available to every computer, tablet, smartphone, or automated crawler that send GET requests to these URLs").

14

Finally, plaintiff's state-law claims raise substantial preemption concerns. This is not simply a matter of HIPAA preemption, as plaintiff's motion asserts (Mem. 11-12), but of conflict preemption as well. *See Murphy v. Nat'l Coll. Ath. Ass'n*, 138 S. Ct. 1461, 1480 (2018) (discussing preemption doctrines). There is a reason the program was initially referred to as the Meaningful Use program—health care providers were reimbursed more under Medicare based on how much patients actually used their patient portals. 42 C.F.R. § 495.20(l)(8)(ii) (requiring report as to whether "[m]ore than 5 percent of all unique patients . . . view, download or transmit to a third party their information during the EHR reporting period"). Indeed, the federal government itself, to this day, uses these very same types of marketing techniques on its own website. *See* https://www.medicare.gov/privacy-policy#third-party (How CMS uses cookies & other technologies on medicare.gov). Plaintiff's claims that ProMedica should be precluded from using internet advertising to grow awareness regarding ProMedica's patient services and thus also the potential availability of the MyChart patient portal itself raise substantial conflict preemption concerns, particularly given that the federal government is engaging in these same practices.

## CONCLUSION

The Court should deny plaintiff's motion to remand.

Respectfully submitted,

*/s/ David Carney*
David A. Carney (0079824)
Joshua D. Rovenger (0099328)
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114
Telephone: (216) 621-0200
Facsimile:  (216) 696-0740
Email: dcarney@bakerlaw.com
Email: jrovenger@bakerlaw.com

*Attorneys for Defendant ProMedica Health System, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically on September 4, 2020 and served via the Court's ECF system on counsel of record.

/s/ *David Carney*
Counsel for Defendant
